UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,           )<br>                                                                )<br>            Plaintiff,                              )    Civil No.<br>                                                                )<br>            v.                                        )    Filed:<br>                                                                )<br>PROFESSIONAL CONSULTANTS      )<br>INSURANCE COMPANY, INC.,        )<br>                                                                )<br>            Defendant.                         )<br>_____) | |

## COMPLAINT

The United States of America, by its attorneys and acting under the direction of the Attorney General of the United States, brings this civil antitrust action to obtain equitable relief against Defendant Professional Consultants Insurance Company, Inc. to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The United States alleges as follows:

### I. Jurisdiction and Venue

1.      The United States brings this action to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court has jurisdiction over the parties to this action and of the subject matter pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331, 1337 and 1345. Venue is proper in this District because Defendant has so stipulated.

### II. Defendant

2.      Defendant Professional Consultants Insurance Company, Inc. ("PCIC") is a professional liability insurance company incorporated under the laws of Vermont. PCIC's principal business is to provide errors and omissions insurance coverage to its three shareholders,

which PCIC calls, and hereafter will be referred to as, its "members." Each of PCIC's three members is a major actuarial consulting firm doing business throughout the United States.

3. At all times relevant to this Complaint, PCIC has been managed and operated by directors, officers, and providers of professional services who concurrently served as directors, officers, or employees of its members.

4. The PCIC members each employ hundreds of professional actuaries throughout the country to serve, on a nationwide basis, clients that require actuarial consulting services. Actuarial consultants are professionals trained and skilled in mathematical and statistical analysis and management of financial and economic risks. Their clients are firms and organizations that require risk analysis and management in various financial and other contexts, including pension plans and other employee benefit plans organized to serve public or government employees, private corporate employees, and members of labor unions.

5. Apart from their joint ownership and management of PCIC, the three PCIC members operate actuarial consulting businesses separately and independently of, and in competition with, each other. Each of the three PCIC members is a major competitor of the others in the provision of actuarial consulting services to employee benefit plans.

### III. Trade and Commerce

6. At all times relevant to this Complaint, PCIC has provided professional liability insurance coverage for claims against its members arising from actuarial consulting businesses conducted by its members, including the provision of actuarial consulting services to employee benefit plans, throughout the United States. These activities of PCIC and its members have been within the flow of, and have substantially affected, interstate commerce.

7. Employee benefit plans engage PCIC's members and other actuarial consulting firms to prepare actuarial risk valuations. Employee benefit plans rely on the work of actuarial consultants to determine employee benefit levels and employer contributions needed to fund the benefits. An error or omission in the work performed by an actuarial consultant can result in substantial monetary losses or other damages to the employee benefit client.

8. To cover exposure to liability claims of clients arising out of mistakes made in their actuarial work, PCIC members historically obtained professional errors and omissions liability insurance. Since the late 1980s and continuing to the present, PCIC has annually provided each of its members with several millions of dollars of such coverage. In addition, the members have individually purchased substantial amounts of additional insurance coverage from commercial insurance companies.

## IV. Claim for Relief

9. Until recently, the PCIC members generally provided actuarial consulting services to employee benefit clients under terms that did not limit a client's rights to recover damages suffered as a result of actuarial errors or omissions. Beginning in as early as the 1999 - 2000 time frame, PCIC, its members, and other actuarial consulting competitors began to experience increasing severity and frequency of liability claims arising out of their respective actuarial consulting businesses. To address the increasing claims experience, the PCIC members considered various ways to mitigate their exposure to liability claims, including instituting or improving professional peer review and other quality control procedures, as well as the use of contractual limitations of liability, or "LOL," in client engagement agreements.

10. Clients that accept LOL in their actuarial consulting engagements are contractually bound to limitations on the amounts or types of damages that may be recoverable as

3

a result of actuarial errors or omissions. Various formulations of LOL include liability "caps" precluding damages beyond a specified dollar amount, limitations based on a multiple of fees charged to clients, and limitations to "direct damages," potentially precluding claims for consequential or other types of damages.

11. In marketplace rivalry among actuarial consulting firms, LOL is a significant basis of the firms' competition for clients and prospective clients. All else equal, a firm that does not require LOL can be at a significant competitive advantage in seeking a client's business over a competing firm that does require LOL. To the extent clients not disposed to accepting LOL can choose to engage actuarial consulting firms that do not require LOL, firms that might otherwise require LOL can be competitively disciplined or constrained from doing so by the potential loss of clients to non-LOL firms.

12. When the PCIC members began to consider implementing LOL, they recognized that unless and until LOL became a matter of widespread usage throughout the actuarial consulting profession, firms implementing LOL would face client resistance and potential loss of business to firms that had not implemented LOL. A senior official of one PCIC member noted that "What I don't want to do is get so far ahead of the market openly, without specific calculation that 'now' is the time, that we become a competitive target." Another PCIC member was "worried that they are way ahead . . . and fear that they are now at a competitive disadvantage." Employees of the third PCIC member had "reservations about adopting these procedures [LOL] too quickly . . . [and] we don't want to lose clients by acting before our competitors do."

13. The PCIC members also recognized that efforts on their part to implement LOL would be less exposed to client resistance and competitive loss of business if other actuarial competitors also began to implement LOL. To avoid being too far "in front of the competition" in

implementing LOL, they needed to obtain information about what other actuarial consulting firms were doing or planning to do. Thus, for example, employees of one PCIC member urged restraint in implementing LOL, at least until the competitive situation could be determined: "We respectfully do not wish to be the first . . . to adopt stringent limitations at the risk of losing our national prominence, let alone a significant amount of business. The losses could be devastating for some practices. Therefore, the [proposed] effective date is left open until further information about our competitors is known."

14.     Beginning as early as in 1999, the PCIC members discussed among themselves their respective consideration and implementation of plans to require LOL of their clients. These discussions took place on many occasions and in several contexts, including at meetings of PCIC's board of directors (comprised of senior officials of each of the PCIC members), at various "PCIC owners meetings" (also attended by senior officials of the PCIC members), in connection with a PCIC working group called the "PCIC Malpractice Avoidance Committee," and other formal and informal communications among themselves.

15.     In addition to enabling and facilitating LOL discussions among the three PCIC members, PCIC sponsored, organized, and conducted a series of profession-wide actuarial meetings, in March 2000, June 2001, and January 2003. These profession-wide meetings were attended by senior representatives not only of the PCIC members but also of five other actuarial firms that competed for employee benefit clients on a nationwide basis. At or in connection with each of these meetings, the attendees exchanged information about plans or efforts to implement LOL among actuarial consulting firms, including but not limited to the following:

   a.     At the March 2000 profession-wide meeting, a number of LOL implementation issues were discussed, including the use of dollar-based limits or multiples

of fees, and possible ways of dealing with clients that resist the limitations. The use of LOL was described by one attendee as a "best practice" that certain of the actuarial consulting firms had begun using. Another attendee noted that "there was an argument made for inclusion of a standard [LOL] clause [in client engagements]" and that "if more and more firms use this sort of approach, it will become standard."

   b. At the June 2001 profession-wide meeting, "a number of firms discussed their own use of contractual safeguards and the clients' acceptance." One of the attendees recounted: "Most firms have either begun implementing . . . or are actively considering [use of contractual safeguards] . . . One firm stated that it had made a firm-wide decision that it will no longer accept unlimited liability. . . We also discussed some ideas about implementing contractual safeguards, such as immediately requiring limitations for new clients and phasing in the requirements for existing clients. . . There seemed to be a consensus that . . . actuarial clients may complain about contractual safeguards but will accept them as they become more widespread."

   c. Shortly after the June 2001 profession-wide meeting, a senior official of one of the non-PCIC competitors at the meeting caused his firm to begin considering LOL implementation. This official, as part of the firm's consideration of LOL, requested and received from a PCIC official sample LOL language to help the firm develop LOL terms for its own client contracts.

16. In addition to the PCIC profession-wide meetings, PCIC and its members engaged in numerous other LOL discussions with representatives of other non-PCIC competitors, including but not limited to the following:

        a.      In October 2001, a PCIC official communicated with an official for one of the non-PCIC competitors that was represented at the PCIC profession-wide meetings but had not begun to implement LOL. The PCIC official advised that "some consulting firms are beginning to implement limits of liability" and encouraged the non-PCIC firm to do likewise: "a strong argument can be made that it is not in any firms' individual best interest to avoid implementing reasonable contractual safeguards." The official of the non-PCIC firm subsequently observed that the PCIC official "feels strongly about the limits of liability and was upset that we were not seeking them," and thereafter the non-PCIC firm itself considered its own implementation of LOL.

        b.      In late 2001, one of the PCIC members was in the process of considering a proposed corporate policy to implement LOL, which it went on to adopt in February 2002. In December 2001, to facilitate adoption of the policy and acceptance among the firm's employees, a PCIC official circulated to the firm's employees a memorandum providing "HIGHLY CONFIDENTIAL" information about competitors' use of LOL and prospective plans to use LOL. The memorandum disclosed that the two other PCIC members had already begun to require LOL of their clients; that one of the non-PCIC competitors had plans to begin implementing LOL; that another competitor was attempting to implement LOL; and that yet another was "strongly considering" implementing LOL.

        c.      In early 2002, an employee benefit client of one of the PCIC members refused to accept proffered LOL terms and decided to seek competitive bids from other actuarial consulting firms in which LOL would not be required. After one of the non-PCIC competitors that attended the PCIC profession-wide meetings submitted a bid without LOL,

a PCIC official found out about the firm's bid, was unhappy that the bid did not require LOL, and contacted a representative of the firm to express his displeasure.

   d. In April 2002, a PCIC official discussed profession-wide LOL implementation with an official of a non-PCIC competitor. The PCIC official apprised the non-PCIC competitor of ongoing LOL implementation activities not only of the three PCIC members, but also those of two other competitors. In return, the official of the non-PCIC competitor disclosed LOL activities of his firm to the PCIC official.

   e. At a professional association conference in September 2003, senior officials of two of the PCIC members and that of a non-PCIC competitor updated each other on the progress of their respective LOL implementation efforts. In the wake of this conversation, the non-PCIC official apprised a colleague at his firm of his discussions with the PCIC competitors, and urged his colleague to "push hard to get liability limiting agreements wherever we can."

  17. Within the framework of the meetings and other communications alleged above, PCIC, its members, and other actuarial consulting competitors agreed among themselves to share competitively sensitive information about each others' plans and efforts to implement LOL. The sharing of this information eliminated or reduced competitive uncertainties and concerns about the potential for losing clients to firms not using LOL, and thus facilitated decisions of PCIC members and other competitors to begin implementing LOL.

  18. The agreement to share LOL information alleged above has resulted in, among other things, the following effects:

      a.    Significant competition among PCIC members and other actuarial consulting firms with respect to liability terms of contracting with employee benefit clients has been restrained;

      b.    Employee benefit plan clients that have accepted LOL terms with PCIC members or other actuarial consulting firms have been deprived of the benefits of unrestrained competition in the setting of actuarial consulting contract terms;

      c.    The use of LOL terms in actuarial consulting contracts with employee benefit plans has been significantly more prevalent than would have been the case in the presence of unrestrained competition among the PCIC members and other actuarial consulting firms.

19. Unless permanently restrained and enjoined, PCIC and its members are free to continue, maintain, or renew the above-described sharing of competitively sensitive LOL information among themselves and other actuarial consulting competitors, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## VI.   Prayer for Relief

WHEREFORE, the Plaintiff United States of America prays:

1. Adjudge the Defendant PCIC and its members as constituting and having engaged in an unlawful combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2. Order that the Defendant PCIC, its members, and their respective officers, directors, employees, successors, and assigns, and all other persons acting or claiming to act on their behalf, be permanently enjoined from engaging in, carrying out, renewing, or attempting to engage in, carry out, or renew the combination and conspiracy alleged herein,

or any other combination or conspiracy having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3. Award to plaintiff its costs of this action and such other and further relief as may be required and the Court may deem just and proper.

Dated: June 24, 2005.

Respectfully Submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
R. Hewitt Pate
Assistant Attorney General
Antitrust Division

_____
J. Bruce McDonald
Deputy Assistant Attorney General
Antitrust Division

_____
Dorothy B. Fountain
Deputy Director of Operations
Antitrust Division

_____
Weeun Wang
Jonathan B. Jacobs
John P. Lohrer
Michael A. Bishop (D.C. Bar # 468693)
Barry L. Creech
Barry J. Joyce
Nicole S. Gordon
Ryan J. Danks

Litigation I Section
Antitrust Division
U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 4000
Washington, D.C. 20530
(202) 307-0001
Facsimile: (202) 307-5802

_____
Mark J. Botti (D.C. Bar # 416948)
Chief, Litigation I Section
Antitrust Division