UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA,  )
)
)
)
Plaintiff  )     CASE NUMBER:  1:05CV01272
)     JUDGE: Gladys Kessler
v.  )     DECK TYPE: Antitrust
)     DATE STAMP:
PROFESSIONAL CONSULTANTS  )
INSURANCE COMPANY, INC.,  )
)
Defendant.  )
)
_____)


COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to the Antitrust Procedures

and Penalties Act ("APPA"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement

relating to the proposed Amended Final Judgment submitted for entry in this civil antitrust

proceeding.

I.     Nature and Purpose of the Proceeding

On June 24, 2005, the United States filed a civil antitrust Complaint against Professional

Consultants Insurance Company, Inc. ("PCIC"), alleging that PCIC, three actuarial consulting firms

that own and manage PCIC, and other actuarial consulting firms agreed among themselves to share

competitively sensitive information about their use of contractual limitations of liability in

violation of Section 1 of the Sherman Act.

The United States has also filed a proposed Amended Final Judgment,[1] designed to prevent

_____

[1]     At the same time the Complaint was filed, the United States also filed a Stipulation and
a proposed Final Judgment.  In substitution of, and to correct a drafting error in, the originally filed

the continuation and eliminate the anticompetitive effects of the violation alleged in the Complaint. The proposed Amended Final Judgment, which is explained more fully below, aims to prevent PCIC and its members from sharing limitations of liability information among themselves, or with other providers of actuarial consulting services, in a manner that may significantly lessen competition.

The United States and PCIC have stipulated that the proposed Amended Final Judgment may be entered after compliance with the APPA. Entry of the proposed Amended Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Amended Final Judgment and to punish violations thereof.

II.     Description of the Events Giving Rise to the Alleged Violation

A.     PCIC, its Members, and the Actuarial Consulting Marketplace

PCIC is a professional liability insurance company owned and managed jointly by three actuarial consulting firms (which call themselves, and are hereinafter referred to as, PCIC "members"). PCIC's principal business is to provide errors and omissions insurance coverage to its members, each of which is a major nationwide provider of actuarial consulting services. The clients of PCIC's members are firms and organizations that require actuarial financial risk analysis and management, including pension funds and other employee benefit plans serving public or government employees, private corporate employees, and members of labor unions.

Apart from their joint ownership and management of PCIC, the three PCIC members are major competitors of each other, particularly in the provision of actuarial consulting services to

proposed Final Judgment, the United States and PCIC jointly filed a proposed Amended Final Judgment concurrently with the filing of the Competitive Impact Statement.

employee benefit plans.  In addition to the PCIC members, six other actuarial consulting firms compete on a nationwide basis to provide actuarial services to employee benefit plans.  Actuarial consulting firms gauge their competitive positions based on their shares of clients among industry-published lists of the 1,000 largest U.S. employee benefit plans.  Based on recent data obtained by the United States, the three PCIC members' combined share of the top 1,000 plans is about 35 percent, and the combined share of all nine national competitors is about 96 percent.

The actuarial consulting firms also evaluate their market positions with reference to three distinct types of employee benefit clients: plans established by corporations or private companies (referred to as "corporate plans"); plans of public or government entities ("public plans"); and plans established by labor organizations and funded by multiple employers ("multi-employer plans").  Recent data indicates that the PCIC members collectively account for about 40 percent of all corporate plans among the top 1,000 plans, and that the combined share of PCIC members and three other firms exceeds 90 percent.  One PCIC member and four other firms have about 92 percent of the top 1,000 public plans.  Two PCIC members and three other firms have about 91 percent of the top 1,000 multiemployer plans.

B.    Anticompetitive Exchange of Information on Limitations of Liability

As alleged in the Complaint, the work performed by actuarial consulting firms for employee benefit clients include risk valuations used to determine employee benefit levels and employer contributions needed to fund the benefits.  In such cases, an actuarial error or omission can result in substantial monetary losses or other damages to the client.  Until recently, PCIC's members generally served their clients under terms that did not limit a client's right to recover damages suffered as a result of actuarial errors or omissions.  To cover exposure to liability claims of clients arising out of mistakes made in their actuarial work, the members historically

obtained professional errors and omissions liability insurance.

As actuarial consulting firms began to experience increasing severity and frequency of liability claims in 1999-2000, the PCIC members considered ways to mitigate their exposure to liability claims. Among other things, they considered instituting or improving professional peer review and other quality control procedures, and they considered using contractual limitations of liability, or "LOL," in client engagement agreements. Clients accepting LOL are contractually bound to limitations on the amounts or types of damages that may be recoverable as a result of actuarial errors or omissions.

The Complaint alleges that the PCIC members recognized that it made a difference whether they implemented LOL unilaterally or collectively, and whether they did so with or without a broad profession-wide movement toward LOL. They understood that unless and until LOL became a matter of widespread usage throughout the actuarial consulting profession, firms implementing LOL would face client resistance and potential loss of business to firms that had not implemented LOL. They also recognized that efforts on their part to implement LOL would be less exposed to client resistance and competitive loss of business if other actuarial competitors also began to implement LOL.

To avoid being "in front of the competition," the PCIC members sought to obtain information about their competitors' plans with respect to LOL. To facilitate the use of LOL by other competitors, they also sought to make others aware of their own LOL implementation efforts. Accordingly, beginning as early as in 1999, the PCIC members engaged in numerous discussions among themselves and with non-PCIC competitors, including at a series of PCIC-sponsored profession-wide meetings, at which the firms disclosed to each other their respective ongoing and prospective LOL implementation policies, plans, and practices. This widespread sharing of LOL

information was not motivated by any purpose of improving marketplace efficiency in the provision of actuarial consulting services, and in fact provided actuarial clients with no procompetitive benefits in their purchases of actuarial consulting services.

As alleged in the Complaint, PCIC, its members, and other actuarial consulting competitors unlawfully agreed among themselves to share competitively sensitive information about each other's plans and efforts to implement LOL.  The challenged exchange of LOL information facilitated at least tacit coordination of competitors' decisions to implement LOL.  The major actuarial consulting firms have tended to concentrate their businesses among three client categories -- corporate, public, and multi-employer -- in a way that has resulted in extremely high concentrations of sales among just a few consulting firms in each of those categories.   Moreover, competitive turn-over of clients occurred relatively infrequently, and the consulting firms do not appear to have competed broadly or vigorously to take established clients away from each other.  Given these conditions, unilateral attempts to implement LOL by any of the firms would have been competitively disruptive, prompting clients to seek competitive alternatives and potentially leading to abandonment of established client-consultant relationships.  Such competitive disruption, from the consulting firms' perspective, would have been undesirable in causing erosion or shifting of the historical patterns of concentration and stability within the client categories, which could lead to increased price competition.  Indeed, one purpose of the challenged conduct was to facilitate the use of LOL as a profession-wide "standard" while avoiding this competitive response, and its actual effect was to induce numerous clients to accept LOL that otherwise would not have done so.

III.    Explanation of the Proposed Amended Final Judgment

The purpose of the  proposed Amended Final Judgment is to prevent PCIC and its members from sharing LOL information among themselves, or with other providers of actuarial consulting

services, in a manner that may significantly lessen competition. Application of the proposed Amended Final Judgment extends not only to PCIC but also to its members, through a requirement that PCIC obtain consent of its members to be bound by the proposed Amended Final Judgment as a condition of PCIC membership. The term of the proposed Amended Final Judgment is ten years from the date of its entry.

The proposed Amended Final Judgment Final Judgment seeks to prevent PCIC and its members from engaging in anticompetitive communications and uses of LOL information while at the same time allowing certain PCIC business requirements for LOL information that do not raise significant competitive concerns. PCIC and its members are thus constrained from communicating about their usage of LOL to the extent of and subject to specified limitations and safeguards as to allow PCIC's continued operation as a provider of professional liability insurance. PCIC is prohibited from requiring its members to implement LOL, also subject to limited allowances for PCIC to engage in reasonable business activities as a professional liability insurer.

The proposed Amended Final Judgment prohibits PCIC and its members from entering into or participating in any agreements among themselves or with any other provider of actuarial consulting services, as to any actual or potential use of LOL. In addition, PCIC and its members are barred from communicating with other providers of actuarial consulting services as to any firm's current or future plans, policies, or practices relating to the use of LOL. Other provisions of the proposed Amended Final Judgment require PCIC and its members to institute antitrust compliance programs, and to follow specified antitrust compliance and notification policies and procedures.

IV.    Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Amended Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against the Defendants.

      V.    <u>Procedures Available for Modification of the Proposed Amended Final Judgment</u>

The United States and Defendants have stipulated that the proposed Amended Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Amended Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Amended Final Judgment within which any person may submit to the United States written comments regarding the proposed Amended Final Judgment. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Amended Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register. Written comments should be submitted to:

> Mark J. Botti
> Chief, Litigation I Section
> Antitrust Division
> United States Department of Justice
> 1401 H Street, N.W., Suite 4000
> Washington, DC 20530

The proposed Amended Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the proposed Amended Final Judgment.

VI.    Alternatives to the Proposed Amended Final Judgment

The United States considered, as an alternative to the proposed Amended Final Judgment, proceeding to a full trial on the merits of its Complaint. The United States is satisfied, however, that the relief contained in the proposed Amended Final Judgment will reestablish and maintain competition among actuarial consulting firms with respect to liability terms of contracting with clients.  In so doing, entry of the proposed Amended Final Judgment will avoid the time, expense and uncertainty of a full trial on the merits of the government's Complaint.

The United States considered, but did not require as an element of the negotiated settlement, prohibiting PCIC members from enforcing LOL terms that they have already obtained from clients.  The United States concluded that barring the PCIC members from enforcing existing LOL terms is not necessary to remediate anticompetitive effects of the challenged conduct.  In this respect, the harm to clients resulting from anticompetitive imposition of LOL is prospective and uncertain, and as the great majority of actuarial clients do not experience faulty actuarial work, would arise only infrequently.  Rather than seeking broadly to prohibit the enforcement of existing LOL terms, the United States believes it sufficient that clients against whom LOL terms may ultimately be advanced will then have the opportunity to assert invalidation of the terms as having been unlawfully imposed.

The United States also considered but did not require the PCIC members to be barred from prospectively implementing LOL in new client engagements for a period of time, as a means of restoring market conditions pre-dating the conduct challenged in the Complaint.  The United States

determined such a measure to be unnecessary because at the present time significant competitive

alternatives continue to exist for clients seeking to avoid LOL. One non-PCIC competitor, the

largest actuarial consulting firm serving multi-employer clients, has to date chosen not to

implement LOL. Another of the non-PCIC firms, which is the second leading competitor as to

public clients and the third leading competitor as to corporate clients, has implemented a relatively

less onerous form of LOL that purports to confine recovery to direct damages, rather than the more

commonly used limitation to a fixed dollar amount or multiple of fees. Certain other firms that

have begun implementing LOL have done so under policies that make allowances for clients to

avoid LOL in their contract negotiations.

> VII.    Standard of Review Under APPA for the Proposed Amended Final Judgment

The APPA requires that proposed consent judgments in antitrust cases brought by the

United States be subject to a sixty-day comment period, after which the Court shall determine

whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In

making that determination, the Court shall consider:

> (A)    the competitive impact of such judgment, including termination
> of alleged violations, provisions for enforcement and modification,
> duration or relief sought, anticipated effects of alternative remedies
> actually considered, whether its terms are ambiguous, and any other
> competitive considerations bearing upon the adequacy of such judgment
> that the court deems necessary to a determination of whether the
> consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant
> market or markets, upon the public generally and individuals alleging
> specific injury from the violations set forth in the complaint including
> consideration of the public benefit, if any, to be derived from a
> determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) and (B). As the United States Court of Appeals for the District of

Columbia Circuit has held, the APPA permits a court to consider, among other things, the

relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

"Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). Thus, in conducting this inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).[2] Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977).

Accordingly, with respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648

---

[2] *See United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (recognizing it was not the court's duty to settle; rather, the court must only answer "whether the settlement achieved [was] within the reaches of the public interest"). A "public interest" determination can be made properly on the basis of the Competitive Impact Statement and Response to Comments filed by the Department of Justice pursuant to the APPA. Although the APPA authorizes the use of additional procedures, 15 U.S.C. § 16(f), those procedures are discretionary. A court need not invoke any of them unless it believes that the comments have raised significant issues and that further proceedings would aid the court in resolving those issues. *See* H.R. Rep. No. 93-1463, 93rd Cong., 2d Sess. 8-9 (1974), *reprinted* in 1974 U.S.C.C.A.N. 6535, 6538.

F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a
> proposed antitrust consent decree must be left, in the first instance, to the
> discretion of the Attorney General.  The court's role in protecting the
> public interest is one of insuring that the government has not breached its
> duty to the public in consenting to the decree.  The court is required to
> determine not whether a particular decree is the one that will best serve
> society, but whether the settlement is "*within the reaches of the public interest*."
> More elaborate requirements might undermine the effectiveness of antitrust
> enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]

The proposed Final Judgment, therefore, should not be reviewed under a standard of

whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it

mandates certainty of free competition in the future.  Court approval of a final judgment requires a

standard more flexible and less strict than the standard required for a finding of liability.  "[A]

proposed decree must be approved even if it falls short of the remedy the court would impose on

its own, as long as it falls within the range of acceptability or is 'within the reaches of public

interest.'"  *United States v. AT&T*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted)

(quoting *Gillette*, 406 F. Supp. at 716), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001

(1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985)

(approving the consent decree even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in

relationship to the violations that the United States has alleged in its Complaint; the APPA does not

---

[3]  *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA]
is limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at 716 (noting
that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor
with a microscope, but with an artist's reducing glass").  *See generally Microsoft*, 56 F.3d at
1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the
allegations charged as to fall outside of the 'reaches of the public interest'").

authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459.  Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id*. at 1459-60.

VIII.    <u>Determinative Documents</u>

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.


Dated:  September ___, 2005.

Washington, D.C.

Respectfully submitted,

Mark J. Botti
Chief, Litigation I Section



_____
Weeun Wang
Ryan Danks
U.S. Department of Justice
Antitrust Division
Litigation I Section
1401 H Street, N.W., Suite 4000
Washington, D.C.  20530
202-307-0001

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a copy of the foregoing Competitive Impact Statement via

facsimile and first class United States mail, this 12th day of September, 2005, on:

Paul C. Cuomo, Esq.
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402
Fax (202) 383-6610
Attorney for Defendant PCIC


_____/s/_____
Ryan J. Danks
Attorney
United States Department of Justice