**Informational and Public Meetings**

Informational meetings and public hearings will be scheduled in Alaska at the following locations: Anchorage, Fairbanks, Wasilla, Susitna Valley, and McKinley Village. The specific dates and times of the meetings and public hearings will be announced in local media. It is the practice of the National Park Service to make comments, including names and addresses of respondents, available for public review. An individual respondent may request that we withhold his or her address from the record, which we will honor to the extent allowable by law. If you wish to have NPS withhold your name and/or address, you must state this prominently at the beginning of your comments. NPS will make all submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, available for public inspection in their entirety.

Dated: August 18, 2005.

**Judy Gottlieb,**
*Acting Regional Director, Alaska.*
[FR Doc. 05–18819 Filed 9–20–05; 8:45 am]
**BILLING CODE 4310–70–P**

**DEPARTMENT OF JUSTICE**

**Antitrust Division**

**United States v. Professional Consultants Insurance Company, Inc.; Proposed Final Judgment and Competitive Impact Statement**

Notice is hereby given pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. 16(b)–(h), that a proposed Final Judgment, Stipulation and Competitive Impact Statement have been filed with the United States District Court for the District of Columbia in *United States* v. *Professional Consultants Insurance Company, Inc.*, Civil Action No. 1:05CV01272. On June 28, 2005, the United States filed a Complaint alleging that Professional Consultants Insurance Company, Inc., violated Section 1 of the Sherman Act, 15 U.S.C. 1. The proposed Final Judgment, filed the same time as the Complaint, requires Professional Consultants Insurance Company, Inc., to end its illegal information sharing activities and create a program to monitor its compliance with the antitrust laws. A proposed Amended Final Judgment was filed in substitution of, and to correct a drafting error in, the originally filed proposed Final Judgment. Copies of the Complaint, proposed Amended Final Judgment and Competitive Impact Statement are available for inspection at the U.S. Department of Justice, Antitrust Division, 325 Seventh Street, NW., Room 200, Washington, DC 20530 and at the Office of the Clerk of the United States District Court for the District of Columbia, 333 Constitution Avenue, NW., Washington, D.C. 20001.

Public comment is invited within 60 days of the date of this notice. Such comments, and responses thereto, will be published in the **Federal Register** and filed with the Court. Comments should be directed to Mark Botti, Chief, Litigation I Section, United States Department of Justice, 1401 H Street, NW., Suite 4000, Washington, DC 20530 (telephone: 202–307–0001).

**Dorothy B. Fountain,**
*Deputy Director of Operations, Antitrust Division.*

**United States District Court for the District of Columbia**

*United States of America, Plaintiff, v. Professional Consultants Insurance Company, Inc., Defendant*

Case Number 1:05CV01272
Judge: Gladys Kessler
Deck Type: Antitrust
Date Stamp: 06/24/2005

**Complaint**

The United States of America, by its attorneys and acting under the direction of the Attorney General of the United States, brings this civil antitrust action to obtain equitable relief against Defendant Professional Consultants Insurance Company, Inc. to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. 1. The United States alleges as follows:

*I. Jurisdiction and Venue*

1. The United States brings this action to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. 1. The Court has jurisdiction over the parties to this action and of the subject matter pursuant to 15 U.S.C. 4 and 28 U.S.C. 1331, 1337 and 1345. Venue is proper in this District because Defendant has so stipulated.

*II. Defendant*

2. Defendant Professional Consultants Insurance Company, Inc. ("PCIC") is a professional liability insurance company incorporated under the laws of Vermont. PCIC's principal business is to provide errors and omissions insurance coverage to its three shareholders, which PCIC calls, and hereafter will be referred to as, its "members." Each of PCIC's three members is a major actuarial consulting firm doing business throughout the United States.

3. At all times relevant to this Complaint, PCIC has been managed and operated by directors, officers, and providers of professional services who concurrently served as directors, officers, or employees of its members.

4. The PCIC members each employ hundreds of professional actuaries throughout the country to serve, on a nationwide basis, clients that require actuarial consulting services. Actuarial consultants are professionals trained and skilled in mathematical and statistical analysis and management of financial and economic risks. Their clients are firms and organizations that require risk analysis and management in various financial and other contexts, including pension plans and other employee benefit plans organized to serve public or government employees, private corporate employees, and members of labor unions.

5. Apart from their joint ownership and management of PCIC, the three PCIC members operate actuarial consulting businesses separately and independently of, and in competition with, each other. Each of the three PCIC members is a major competitor of the others in the provision of actuarial consulting services to employee benefit plans.

*III. Trade and Commerce*

6. At all times relevant to this Complaint, PCIC has provided professional liability insurance coverage for claims against its members arising from actuarial consulting businesses conducted by its members, including the provision of actuarial consulting services to employee benefit plans, throughout the United States. These activities of PCIC and its members have been within the flow of, and have substantially affected, interstate commerce.

7. Employee benefit plans engage PCIC's members and other actuarial consulting firms to prepare actuarial risk valuations. Employee benefit plans rely on the work of actuarial consultants to determine employee benefit levels and employer contributions needed to fund the benefits. An error or omission in the work performed by an actuarial consultant can result in substantial monetary losses or other damages to the employee benefit client.

8. To cover exposure to liability claims of clients arising out of mistakes made in their actuarial work, PCIC members historically obtained professional errors and omissions liability insurance. Since the late 1980s and continuing to the present, PCIC has

annually provided each of its members with several millions of dollars of such coverage. In addition, the members have individually purchased substantial amounts of additional insurance coverage from commercial insurance companies.

*IV. Claim for Relief*

9. Until recently, the PCIC members generally provided actuarial consulting services to employee benefit clients under terms that did not limit a client's rights to recover damages suffered as a result of actuarial errors or omissions. Beginning in as early as the 1999–2000 time frame, PCIC, its members, and other actuarial consulting competitors began to experience increasing severity and frequency of liability claims arising out of their respective actuarial consulting business. To address the increasing claims experience, the PCIC members considered various ways to mitigate their exposure to liability claims, including instituting or improving professional peer review and other quality control procedures, as well as the use of contractual limitations of liability, or ''LOL,'' in client engagement agreements.

10. Clients that accept LOL in their actuarial consulting engagements are contractually bound to limitations on the amounts or types of damages that may be recoverable as a result of actuarial errors or omissions. Various formulations of LOL include liability ''caps'' precluding damages beyond a specified dollar amount, limitations based on a multiple of fees charged to clients, and limitations to ''direct damages,'' potentially precluding claims for consequential or other types of damages.

11. In marketplace rivalry among actuarial consulting firms, LOL is a significant basis of the firms' competition for clients and prospective clients. All else equal, a firm that does not require LOL can be at a significant competitive advantage in seeking a client's business over a competing firm that does require LOL. To the extent clients not disposed to accepting LOL can choose to engage actuarial consulting firms that do not require LOL, firms that might otherwise require LOL can be competitively disciplined or constrained from doing so by the potential loss of clients to non-LOL firms.

12. When the PCIC members began to consider implementing LOL, they recognized that unless and until LOL became a matter of widespread usage throughout the actuarial consulting profession, firms implementing LOL would face client resistance and potential loss of business to firms that had not implemented LOL. A senior official of one PCIC member noted that ''What I don't want to do is get so far ahead of the market openly, without specific calculation that 'now' is the time, that we become a competitive target.'' Another PCIC member was ''worried that they are way ahead * * * and fear that they are now at a competitive disadvantage.'' Employees of the third PCIC member had ''reservations about adopting these procedures [LOL] too quickly * * * [and] we don't want to lose clients by acting before our competitors do.''

13. The PCIC members also recognized that efforts on their part to implement LOL would be less exposed to client resistance and competitive loss of business if other actuarial competitors also began to implement LOL. To avoid being too far ''in front of the competition'' in implementing LOL, they needed to obtain information about what other actuarial consulting firms were doing or planning to do. Thus, for example, employees of one PCIC member urged restraint in implementing LOL, at least until the competitive situation could be determined: ''We respectfully do not wish to be the first * * * to adopt stringent limitations at the risk of losing our national prominence, let alone a significant amount of business. The losses could be devastating for some practices. Therefore, the [proposed] effective date is left open until further information about our competitors is known.''

14. Beginning as early as in 1999, the PCIC members discussed among themselves their respective consideration and implementation of plans to require LOL of their clients. These discussions took place on many occasions and in several contexts, including at meetings of PCIC's board of directors (comprised of senior officials of each of the PCIC members), at various ''PCIC owners meetings'' (also attended by senior officials of the PCIC members), in connection with a PCIC working group called the ''PCIC Malpractice Avoidance Committee,'' and other formal and informal communications among themselves.

15. In addition to enabling and facilitating LOL discussions among the three PCIC members, PCIC sponsored, organized, and conducted a series of profession-wide actuarial meetings, in March 2000, June 2001, and January 2003. These profession-wide meetings were attended by senior representatives not only of the PCIC members but also of five other actuarial firms that competed for employee benefit clients on a nationwide basis. At or in connection with each of these meetings, the attendees exchanged information about plans or efforts to implement LOL among actuarial consulting firms, including but not limited to the following:

a. At the March 2000 profession-wide meeting, a number of LOL implementation issues were discussed, including the use of dollar-based limits or multiples of fees, and possible ways of dealing with clients that resist the limitations. The use of LOL was described by one attendee as a ''best practice'' that certain of the actuarial consulting firms had begun using. Another attendee noted that ''there was an argument made for inclusion of a standard [LOL] clause [in client engagements]'' and that ''if more and more firms use this sort of approach, it will become standard.''

b. At the June 2001 profession-wide meeting, ''a member of firms discussed their own use of contractual safeguards and the clients' acceptance.'' One of the attendees recounted: ''Most firms have either begun implementing * * * or are actively considering [use of contractual safeguards] * * * One firm stated that it had made a firm-wide decision that it will no longer accept unlimited liability * * * We also discussed some ideas about implementing contractual safeguards, such as immediately requiring limitations for new clients and phasing in the requirements for existing clients * * * There seemed to be a consensus that * * * actuarial clients may complain about contractual safeguards but will accept them as they become more widespread.''

c. Shortly after the June 2001 profession-wide meeting, a senior official of one of the non-PCIC competitors at the meeting caused his firm to begin considering LOL implementation. This official, as part of the firm's consideration of LOL, requested and received from a PCIC official sample LOL language to help the firm develop LOL terms for its own client contracts.

16. In addition to the PCIC profession-wide meetings, PCIC and its members engaged in numerous other LOL discussions with representatives of other non-PCIC competitors, including but not limited to the following:

a. In October 2001, a PCIC official communicated with an official for one of the non-PCIC competitors that was represented at the PCIC profession-wide meetings but had not begun to implement LOL. The PCIC official advised that ''some consulting firms are beginning to implement limits of liability'' and encouraged the non-PCIC firm to do likewise: ''a strong argument

can be made that it is not in any firms' individual best interest to avoid implementing reasonable contractual safeguards.'' The official of the non-PCIC firm subsequently observed that the PCIC official ''feels strongly about the limits of liability and was upset that we were not seeking them,'' and thereafter the non-PCIC firm itself considered its own implementation of LOL.

b. In late 2001, one of the PCIC members was in the process of considering a proposed corporate policy to implement LOL, which it went on to adopt in February 2002. In December 2001, to facilitate adoption of the policy and acceptance among the firm's employees, a PCIC official circulated to the firm's employees a memorandum providing ''HIGHLY CONFIDENTIAL'' information about competitor's use of LOL and prospective plans to use LOL. The memorandum disclosed that the two other PCIC members had already begun to require LOL of their clients; that one of the non-PCIC competitors had plans to begin implementing LOL; that another competitor was attempting to implement LOL; and that yet another was ''strongly considering'' implementing LOL.

c. In early 2002, an employee benefit client of one of the PCIC members refused to accept proffered LOL terms and decided to seek competitive bids from other actuarial consulting firms in which LOL would not be required. After one of the non-PCIC competitors that attended the PCIC profession-wide meetings submitted a bid without LOL, a PCIC official found out about the firm's bid, was unhappy that the bid did not require LOL, and contacted a representative of the firm to express his displeasure.

d. In April 2002, a PCIC official discussed profession-wide LOL implementation with an official of a non-PCIC competitor. The PCIC official apprised the non-PCIC competitor of ongoing LOL implementation activities not only of the three PCIC members, but also those of two other competitors. In return, the official of the non-PCIC competitor disclosed LOL activities of his firm to the PCIC official.

e. At a professional association conference in September 2003, senior officials of two of the PCIC members and that of a non-PCIC competitor updated each other on the progress of their respective LOL implementation efforts. In the wake of this conversation, the non-PCIC official apprised a colleague at his firm of his discussions with the PCIC competitors, and urged his colleague to ''push hard to get liability limiting agreements wherever we can.''

17. Within the framework of the meetings and other communications alleged above, PCIC, its members, and other actuarial consulting competitors agreed among themselves to share competitively sensitive information about each others' plans and efforts to implement LOL. The sharing of this information eliminated or reduced competitive uncertainties and concerns about the potential for losing clients to firms not using LOL, and thus facilitated decisions of PCIC members and other competitors to begin implementing LOL.

18. The agreement to share LOL information alleged above has resulted in, among other things, the following effects:

a. Significant competition among PCIC members and other actuarial consulting firms with respect to liability terms of contracting with employee benefit clients has been restrained;

b. Employee benefit plan clients that have accepted LOL terms with PCIC members or other actuarial consulting firms have been deprived of the benefits of unrestrained competition in the setting of actuarial consulting contract terms;

c. The use of LOL terms in actuarial consulting contracts with employee benefit plans has been significantly more prevalent than would have been the case in the presence of unrestrained competition among the PCIC members and other actuarial consulting firms.

19. Unless permanently restrained and enjoined, PCIC and its members are free to continue, maintain, or renew the above-described sharing of competitively sensitive LOL information among themselves and other actuarial consulting competitors, in violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

*VI. Prayer for Relief*

*Wherefore, the Plaintiff United States of America prays:*

1. Adjudge the Defendant PCIC and its members as constituting and having engaged in an unlawful combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. 1;

2. Order that the Defendant PCIC, its members, and their respective officers, directors, employees, successors, and assigns, and all other persons acting or claiming to act on their behalf, be permanently enjoined from engaging in, carrying out, renewing, or attempting to engage in, carry out, or renew the combination and conspiracy alleged herein, or any other combination or conspiracy having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. 1;

3. Award to plaintiff its costs of this action and such other and further relief as may be required and the Court may deem just and proper.

Dated: June 24, 2005.

Respectfully Submitted,

**For Plaintiff United States of America**

R. Hewitt Pate,
*Assistant Attorney General,*
*Antitrust Division.*

J. Bruce McDonald,
*Deputy Assistant Attorney General,*
*Antitrust Division.*

Dorothy B. Fountain,
*Deputy Director of Operations,*
*Antitrust Division.*

Mark J. Botti (D.C. Bar # 416948),
*Chief, Litigation I Section,*
*Assistant Attorney General*

Weeun Wage,
Jonathan B. Jacobs,
John P. Lohrer,
Michael A. Bishop (D.C. Bar #468693),
Barry L. Creech,
Barry J. Joyce,
Nicole S. Gordon,
Ryan J. Danks.
*Litigation I Section,*
*Antitrust Division,*
*U.S. Department of Justice,*
*City Center Building,*
*1401 H Street, NW., Suite 4000,*
*Washington, DC 20530.*
*(202) 307–0001.*
*Facsimile: (202) 307–5802.*

**United States District Court for the District of Columbia**

*United States of America, Plaintiff v. Professional Consultants Insurance Company, Inc., Defendant*

Civil No. 1:05CV01272
Filed:

**Amended Final Judgment**

*Whereas*, Plaintiff, United States of America, filed its Complaint on June 24, 2005, alleging Defendant's violation of Section 1 of the Sherman Act, and Plaintiff and Defendant, by their respective attorneys, have consented to the entry of this final Judgment without trial or adjudication of any issue of fact or law, and without the Final Judgment constituting any evidence against or admission by Defendant, or any other entity, as to any issue of fact or law;

*And Whereas*, Defendant agrees to be bound by the provisions of this Final Judgment pending its approval by the Court;

*And Whereas*, the essence of this Final Judgment is the prohibition of certain alleged information exchanging activities;

*Now Therefore,* before any testimony is taken, without trial or adjudication of any

issue of fact or law, and upon consent of the parties, it is *ordered, adjudged and decreed*:

*I. Jurisdiction*

This Court has jurisdiction over the subject matter of and the parties to this action. For purposes of this Final Judgment only, Defendant stipulates that the Complaint states a claim upon which relief may be granted against Defendant under Section 1 of the Sherman Act, as amended (15 U.S.C. 1).

*II. Definitions*

A. ''PCIC'' means Professional Consultants Insurance Company, Inc., any of its successors and assigns, subsidiaries, divisions, affiliates, partnerships, and joint ventures, and any of their directors, officers, managers, agents, and employees when serving in such capacity.

B. ''PCIC member'' or ''member'' means any current shareholder of PCIC, any shareholder added to PCIC membership at any time during the term of this Final Judgment, any of such shareholders' successors and assigns, any of their subsidiaries, divisions, partnerships, and any of their directors, officers, managers, agents, and employees when serving in such capacity.

C. ''PCIC business requirements'' means rating, assessing, or underwriting professional liability insurance for current PCIC members or firms under consideration for PCIC membership; allowing PCIC board members to make informed decisions about whether to accept or deny membership as to prospective members; preparing reinsurance submissions and responding to reinsurers' requests for information; allowing PCIC board members to evaluate PCIC's risk profile, the risk profile of firms under consideration for PCIC membership and otherwise meet fiduciary obligations to PCIC; allowing PCIC members to make informed decisions about continued participation in PCIC or potential members to make informed decisions about participating in PCIC; and responding to requests for information by auditors and regulatory agencies.

D. ''Actuarial consulting services'' means any actuarial services provided by actuarial consulting firms to any clients of such firms, including but not limited to any such services relating to employee benefit plans.

E. ''Aggregated information'' means information that reflects aggregation of information as to different clients, transactions, or service offerings. ''Aggregated information'' does not include information that is specific to individual identifiable clients or transactions.

F. ''Agreement'' means any agreement or understanding, formal or informal, oral or written.

G. ''Communicate'' means to provide, disclose, disseminate, solicit, share, or exchange information in any manner or form, including by oral, written, or electronic means.

H. ''LOL'' means contractual limitations of liability in the provision of actuarial consulting services.

I. ''LOL information'' means information about an actuarial consulting firm's use of LOL and information regrading an actuarial consulting firm's plans, policies or practices relating to its use of LOL.

J. ''Prohibited LOL Information'' means current, client specific information about an actuarial firm's use of LOLs and information regarding an actuarial firm's current or future plans, policies or practices relating to its use of LOLs.

*III. Applicability*

A. This Final Judgment applies to PCIC, as defined above each consenting PCIC member individually, and all other persons in active concert or participation with PCIC who receive actual notice of this Final Judgment by personal service or otherwise.

B. PCIC shall require, as a condition of membership in PCIC, that each PCIC member consent to be bound by the Judgment, throughout the term of the Judgment, regardless of whether the member continues or discontinues PCIC membership or whether PCIC continues or ceases to exist as an entity.

*IV. LOL Provisions*

A. PCIC shall not communicate LOL information to any PCIC member or other representative of PCIC, or to any representative of any PCIC member, except as limited to the following extent:

1. PCIC's Antitrust Compliance Office, to be established by PCIC pursuant to ¶ V.A. of this Final Judgment, and/or an independent third party working with PCIC's Antitrust Compliance Office, and in a format approved by PCIC's Antitrust Compliance Office, may communicate historical and aggregated LOL information to members of PCIC's board of directors (including alternate directors), professional and administrative service providers working for PCIC, and the respective senior management of PCIC's members regularly involved in decision-making with respect to PCIC's business requirements, solely for purposes of an only as reasonably necessary to accomplish PCIC business requirements. PCIC's Antitrust compliance Office may also communicate historical and aggregated LOL information to a prospective member of PCIC if requested by the prospective member for the purpose of making an informed decision about participating in PCIC.

2. LOL information communicated pursuant to ¶ IV.A.1. of this Final Judgment shall be labeled ''Confidential; Disclosure and Usage Subject to PCIC's Antitrust Compliance Office,'' and shall be preserved and maintained by PCIC's Antitrust Compliance Office ready for possible inspection by or production to the United States.

3. Except to serve a purpose for which the information was communicated pursuant to ¶ IV.A.1., recipients of LOL information communicated pursuant to ¶ IV.A.1 shall not further communicate any such information to any other PCIC member or to any representative of any other provider of actuarial consulting services, and shall not further communicate or use any such information in any manner.

B. A PCIC member may communicate to PCIC's Antitrust compliance Office and/or the independent third party, not more than twice per calendar year, historical and aggregated information about its usage of LOLs, solely for purposes of and only as reasonably necessary to accomplish PCIC's business requirements.

C. PCIC shall not require any member to adopt, implement, maintain, or engage in any policies, plans, or practices relating to LOL usage, except that:

1. PCIC may use historical and aggregated LOL information to accomplish PCIC's business requirements.

2. PCIC may deny or exclude a member as to professional liability insurance coverage in excess of $15 million, but only if:

(a) Reinsurance to be obtained by PCIC for the denied or excluded coverage is conditioned upon usage of LOL and the member does not satisfy the conditions,

(b) Reinsurance to be obtained by PCIC for the denied for excluded coverage is not otherwise reasonably commercially available at a reasonable price,

(c) At the members' request, PCIC will continue to provide the member with primary coverage of not less than $15 million,

(d) PCIC provides the United States with written notice of the facts and circumstances of such denial or exclusion within ten business days of the denial or exclusion to the member, and

(e) PCIC preserves and maintains ready for possible inspection or production all PCIC communications with reinsurers or members and other records relating to the exclusion or denial.

D. PCIC and its members shall not:

1. Enter into or participate in any agreement between or among any of themselves with respect to any actual or potential usage of LOL, provided that the United States will not assert a violation of this provision based solely on parallel conduct of the PCIC members.

2. Enter into or participate in any agreement with any representatives of any non-member providers of actuarial consulting services with respect to any actual or potential usage of LOL.

3. Communicate with any representatives of any member or non-member providers of actuarial consulting services with respect to any Prohibited LOL Information.

E. Notwithstanding any provisions of this Final Judgment:

1. PCIC may obtain client-specific LOL information from a PCIC member to the extent reasonably necessary to discuss a specific actual or threatened professional liability claim against the member, even if the LOL information is Prohibited LOL Information.

2. PCIC members are not prohibited from unilaterally disclosing LOL information, including Prohibited LOL Information, to clients or prospective clients, to the press or news media, and in connection with SEC or other regulatory filings, or LOL information that is in the public domain. Moreover, PCIC members are not prohibited from disclosing or receiving LOL information, including Prohibited LOL Information, when conducting business with another actuarial consulting firm in a vendor-vendee relationship, or when communicating with affiliated actuarial consulting firms based in other countries.

3. PCIC and its members are not prohibited from engaging in conduct protected under the Noerr-Pennington doctrine.

4. PCIC members are not prohibited from conducting due diligence with respect to LOLs in connection with an actual or contemplated (a) acquisition of another actuarial consulting firm; (b) purchase of an actuarial consulting business from another actuarial consulting firm; or (c) sale of an actuarial consulting business to another actuarial consulting firm. Moreover, to the extent reasonably necessary, PCIC members are not prohibited from conducting due diligence with respect to LOLs in connection with an evaluation of whether to become a shareholder or member of an insurance company (captive or not) other than PCIC.

F. Nothing in this Final Judgment shall prohibit or interfere with PCIC's right to grant or deny coverage, or admit or deny new members, for any reason unrelated to a current or prospective PCIC member's use of LOLs.

*V. Antitrust Compliance and Notification*

A. PCIC shall establish an Antitrust Compliance Office, including appointment of an Antitrust Compliance Officer, within 30 days of entry of this Final Judgment, as follows:

1. The Antitrust Compliance Office established by PCIC shall be staffed and maintained independently of PCIC's members.

2. Each PCIC Antitrust Compliance Officer appointed pursuant to ¶ V.A. shall be an attorney with substantial experience with the antitrust laws and shall not have any other responsibilities with respect to PCIC's operations.

B. Each Antitrust Compliance Officer appointed pursuant to ¶ V.A. shall be responsible for establishing and implementing an antitrust compliance program for PCIC and ensuring PCIC's compliance with this Final Judgment, including the following:

1. The PCIC Compliance Officer shall furnish a copy of this Final Judgment (a) within thirty (30) days of entry of this Final Judgment to each director or officer of PCIC, each representative of a PCIC member working with PCIC, and each individual who receives LOL information pursuant to ¶ IV.A.1, and (b) within thirty (30) days to each person who succeeds to any such position.

2. The PCIC Compliance Officer shall obtain from each person designated in ¶ V.B.1. of this Final Judgment a signed certification that the person has read, understands, and agrees to comply with the provisions of this Final Judgment, to the best of his/her knowledge at the time the certification is made is not aware of any violation of this Final Judgment by PCIC that has not already been reported to the PCIC Compliance Officer, and understands that failure to comply with this Final Judgment may result in conviction for criminal contempt of court.

3. Upon learning of any potential violation of any provision of this Final Judgment, the PCIC Compliance Officer shall forthwith take appropriate action to terminate or modify the activity so as to comply with this Final Judgment. Any such action shall be reported in the annual compliance report required by ¶ V.B.4. of this Final Judgment.

4. For each year during the term of this Final Judgment, on or before the anniversary date of this Final Judgment, the PCIC Compliance Officer shall file with the United States a report as to the fact and manner of its compliance with the provisions of this Final Judgment. In addition, the report must identify any individual who received LOL information pursuant to ¶ IV.A.1.

C. PCIC shall require, as a condition of membership in PCIC, that each PCIC member agree to establish an antitrust compliance program within 90 days of the entry of this Final Judgment, or with respect to a new PCIC member within 90 days of membership. Each PCIC member's antitrust compliance program must include the policies and procedures described in ¶ V.B.1–4.

D. PCIC shall cause to be published a written notice in the form attached an Appendix to this Final Judgment, in Pensions & Investments and in Pensions & Investments Online, within sixty (60) days of the entry of this Final Judgment.

*VI. Compliance Inspection*

A. For purposes of determining or securing compliance with this Final Judgment, or of determining whether this Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the PCIC and its members, be permitted:

1. Access during PCIC's and its members' office hours to inspect and copy, or at the United States' option, to require PCIC and its members to provide copies of all books, ledgers, accounts, records, and documents in their possession, custody, or control, relating to any matters contained in this Final Judgment; and

2. To interview, either informally or on the record, PCIC's and its members' officers, employees, or other representatives, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by PCIC or its members.

B. Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, PCIC and its members shall submit written reports and interrogatory responses, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C. No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at this time information or documents are furnished by PCIC or a PCIC member to the United States, PCIC, or the member represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and PCIC or the member marks each pertinent page of such material, ''Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure,'' then the United States shall give ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

*VII. Retention of Jurisdiction*

This Court retains jurisdiction to enable any party or any PCIC member that consents to be bound by this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and punish violations of its provisions.

*VIII. Public Interest Determination*

Entry of this Final Judgment is in the public interest.

*IX. Term*

This Final Judgment shall expire ten (10) years after the day of its entry.

Dated: _____

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. 16.

_____
United States District Judge

**Appendix**

On June 24, 2005, the United States Department of Justice filed a civil suit alleging that Professional Consultants Insurance Company (''PCIC'') has engaged in certain practices in violation of Section 1 of the Sherman Act. PCIC is a Vermont-based captive insurance company that provides professional liability insurance to three actuarial consulting firms (hereafter referred to as ''PCIC''). PCIC has agreed to entry of a civil consent decree to settle this matter. The consent decree does not constitute evidence or admission by any party with respect to any issue of fact or law. The consent decree applies to PCIC and its consenting members, as well as their directors, officers, managers, agents, and employees.

The Justice Department's suit alleges that PCIC and its members engaged in the sharing of competitively sensitive information relating to the use of contractual limitations of liability (or ''LOL'') in actuarial consulting engagements with pension funds and other employee benefit plans. The consent decree is aimed at prohibiting PCIC and its members from sharing LOL information among themselves, or with other providers of actuarial consulting services.

Among other things, the consent decree prohibits PCIC and its members from

communicating among themselves with respect to LOL information, except to a specified extent and subject to safeguards reflecting PCIC's reasonable need for use of LOL information to provide its members with professional liability insurance coverage. The consent decree also prohibits PCIC and its members from entering into or participating in any agreement, among themselves or with any other providers of actuarial consulting services, with respect to any actual or potential use of LOL; and it prohibits PCIC and its members from communicating with other providers of actuarial consulting services with respect to any firm's current or future plans, policies, or practices relating to the use of LOLs. Under the consent decree, PCIC must require, as a condition of PCIC membership, that its members be fully bound by the terms of the decree. In addition, the consent decree also requires PCIC and its members to establish antitrust compliance programs and notification procedures.

Interested persons may address comments to Mark J. Botti, Chief, Litigation I Section, Antitrust Division, U.S. Department of Justice, 1401 H Street, NW., Suite 4000, Washington, DC 20530, within 60 days of the date of this notice.

**United States District Court for the District of Columbia**

*United States of America, Plaintiff v. Professional Consultants Insurance Company, Inc., Defendant*

CASE NUMBER: 1:05CV01272
JUDGE: Gladys Kessler
DECK TYPE: Antitrust
DATE STAMP:

**Competitive Impact Statement**

Plaintiff United States of America ("United States"), pursuant to the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. 16(b)–(h), files this Competitive Impact Statement relating to the proposed Amended Final Judgment submitted for entry in this civil antitrust proceeding.

*I. Nature and Purpose of the Proceeding*

On June 24, 2005, the United States filed a civil antitrust Complaint against Professional Consultants Insurance Company, Inc. ("PCIC"), alleging that PCIC, three actuarial consulting firms that own and manage PCIC, and other actuarial consulting firms agreed among themselves to share competitively sensitive information about their use of contractual limitations of liability in violation of Section 1 of the Sherman Act.

The United States has also filed a proposed Amended Final Judgment,[1] designed to prevent the continuation and eliminate the anticompetitive effects of the violation alleged in the Complaint. The proposed Amended Final Judgment, which is explained more fully below, aims to prevent PCIC and its members from sharing limitations of liability information among themselves, or with other providers of actuarial consulting services, in a manner that may significantly lessen competition.

The United States and PCIC have stipulated that the proposed Amended Final Judgment may be entered after compliance with the APPA. Entry of the proposed Amended Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Amended Final Judgment and to punish violations thereof.

*II. Description of the Events Giving Rise to the Alleged Violation*

A. PCIC, Its Members, and the Actuarial Consulting Marketplace

PCIC is a professional liability insurance company owned and managed jointly by three actuarial consulting firms (which call themselves, and are hereinafter referred to as, PCIC "members"). PCIC's principal business is to provide errors and omissions insurance coverage to its members, each of which is a major nationwide provider of actuarial consulting services. The clients of PCIC's members are firms and organizations that require actuarial financial risk analysis and management, including pension funds and other employee benefit plans serving public or government employees, private corporate employees, and members of labor unions.

Apart from their joint ownership and management of PCIC, the three PCIC members are major competitors of each other, particularly in the provision of actuarial consulting services to employee benefit plans. In addition to the PCIC members, six other actuarial consulting firms compete on a nationwide basis to provide actuarial services to employee benefit plans. Actuarial consulting firms gauge their competitive positions based on their shares of clients among industry-published lists of the 1,001 largest U.S. employee benefit plans. Based on recent data obtained by the United States, the three PCIC members' combined share of the top 1,000 plans is about 35 percent, and the combined share of all nine national competitors is about 96 percent.

The actuarial consulting firms also evaluate their market positions with reference to three distinct types of employee benefit clients: plans established by corporations or private companies (referred to as "corporate plans"); plans of public or government entities ("public plans"); and plans established by labor organizations and funded by multiple employers ("multi-employer plans"). Recent data indicates that the PCIC members collectively account for about 40 percent of all corporate plans among the top 1,000 plans, and that the combined share of PCIC members and three other firms exceeds 90 percent. One PCIC member and four other firms have about 92 percent of the top 1,000 public plans. Two PCIC members and three other firms have about 91 percent of the top 1,000 multiemployer plans.

B. Anticompetitive Exchange of Information on Limitations of Liability

As alleged in the Complaint, the work performed by actuarial consulting firms for employee benefit clients include risk valuations used to determine employee benefit levels and employer contributions needed to fund the benefits. In such cases, an actuarial error or omission can result in substantial monetary losses or other damages to the client. Until recently, PCIC's members generally served their clients under terms that did not limit a client's right to recover damages suffered as a result of actuarial errors or omissions. To cover exposure to liability claims of clients arising out of mistakes made in their actuarial work, the members historically obtained professional errors and omissions liability insurance.

As actuarial consulting firms began to experience increasing severity and frequency of liability claims in 1999–2000, the PCIC members considered ways to mitigate their exposure to liability claims. Among other things, they considered instituting or improving professional peer review and other quality control procedures, and they considered using contractual limitations of liability, or "LOL," in client engagement agreements. Clients accepting LOL are contractually bound to limitations on the amounts or types of damages that may be recoverable as a result of actuarial errors or omissions.

The Complaint alleges that the PCIC members recognized that it made a difference whether they implemented LOL unilaterally or collectively, and whether they did so with or without a broad profession-wide movement toward LOL. They understood that unless and until LOL became a matter of widespread usage throughout the actuarial consulting profession, firms implementing LOL would face client resistance and potential loss of business to firms that had not implemented LOL. They also recognized that efforts on their part to implement LOL would be less exposed to client resistance and competitive loss of business if other actuarial competitors also began to implement LOL.

To avoid being "in front of the competition," the PCIC members sought to obtain information about their competitors' plans with respect to LOL. To facilitate the use of LOL by other competitors, they also sought to make others aware of their own LOL implementation efforts. Accordingly, beginning as early as in 1999, the PCIC members engaged in numerous discussions among themselves and with non-PCIC competitors, including at a series of PCIC-sponsored profession-wide meetings, at which the firms disclosed to each other their respective ongoing and prospective LOL implementation policies, plans, and practices. This widespread sharing of LOL information was not motivated by any purpose of improving marketplace efficiency in the provision of actuarial consulting services, and in fact provided actuarial clients with no procompetitive benefits in their purchase of actuarial consulting services.

As alleged in the Complaint, PCIC, its members, and other actuarial consulting competitors unlawfully agreed among themselves to share competitively sensitive information about each other's plans and efforts to implement LOL. The challenged

---

[1] At the same time the Complaint was filed, the United States also filed a Stipulation and a proposed Final Judgment. In substitution of, and to correct a drafting error in, the originally filed proposed Final Judgment, the United States and PCIC jointly filed a proposed Amended Final Judgment concurrently with the filing of the Competitive Impact Statement.

exchange of LOL information facilitated at least tacit coordination of competitor's decisions to implement LOL. The major actuarial consulting firms have tended to concentrate their businesses among three client categories—corporate, public, and multi-employer—in a way that has resulted in extremely high concentrations of sales among just a few consulting firms in each of those categories. Moreover, competitive turnover of clients occurred relatively infrequently, and the consulting firms do not appear to have competed broadly or vigorously to take established clients away from each other. Given these conditions, unilateral attempts to implement LOL by any of the firms would have been competitively disruptive, prompting clients to seek competitive alternatives and potentially leading to abandonment of established client-consultant relationships. Such competitive disruption, from the consulting firms' perspective, would have been undesirable in causing erosion or shifting of the historical patterns of concentration and stability within the client categories, which could lead to increased price competition. Indeed, one purpose of the challenged conduct was to facilitate the use of LOL as a profession-wide "standard" while avoiding this competitive response, and its actual effect was to induce numerous clients to accept LOL that otherwise would not have done so.

### III. Explanation of the Proposed Amended Final Judgment

The purpose of the proposed Amended Final Judgment is to prevent PCIC and its members from sharing LOL information among themselves, or with other providers of actuarial consulting services, in a manner that may significantly lessen competition. Application of the proposed Amended Final Judgment extends not only to PCIC but also to its members, through a requirement that PCIC obtain consent of its members to be bound by the proposed Amended Final Judgment as a condition of PCIC membership. The term of the proposed Amended Final Judgment is ten years from the date of its entry.

The proposed Amended Final Judgment Final Judgment seeks to prevent PCIC and its members from engaging in anticompetitive communications and uses of LOL information while at the same time allowing certain PCIC business requirements for LOL information that do not raise significant competitive concerns. PCIC and its members are thus constrained from communicating about their usage of LOL to the extent of and subject to specified limitations and safeguards as to allow PCIC's continued operation as a provider of professional liability insurance. PCIC is prohibited from requiring its members to implement LOL, also subject to limited allowances for PCIC to engage in reasonable business activities as a professional liability insurer.

The proposed Amended Final Judgment prohibits PCIC and its members from entering into or participating in any agreements among themselves or with any other provider of actuarial consulting services, as to any actual or potential use of LOL. In addition, PCIC and its members are barred from communicating with other providers of actuarial consulting services as to any firm's current or future plans, policies, or practices relating to the use of LOL. Other provisions of the proposed Amended Final Judgment require PCIC and its members to institute antitrust compliance programs, and to follow specified antitrust compliance and notification policies and procedures.

### IV. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Amended Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against the Defendants.

### V. Procedures Available for Modification of the Proposed Amended Final Judgment

The United States and Defendants have stipulated that the proposed Amended Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Amended Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Amended Final Judgment within which any person may submit to the United States written comments regarding the proposed Amended Final Judgment. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the **Federal Register**. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Amended Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the **Federal Register**. Written comments should be submitted to:
Mark J. Botti,
*Chief, Litigation I Section,*
*Antitrust Division,*
*United States Department of Justice,*
*1401 H Street, NW., Suite 4000,*
*Washington, DC 20530.*

The proposed Amended Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the proposed Amended Final Judgment.

### VI. Alternatives to the Proposed Amended Final Judgment

The United States considered, as an alternative to the proposed Amended Final Judgment, proceeding to a full trial on the merits of its Complaint. The United States is satisfied, however, that the relief contained in the proposed Amended Final Judgment will reestablish and maintain competition among actuarial consulting firms with respect to liability terms of contracting with clients. In so doing, entry of the proposed Amended Final Judgment will avoid the time, expense and uncertainty of a full trial on the merits of the government's Complaint.

The United States considered, but did not require as an element of the negotiated settlement, prohibiting PCIC members from enforcing LOL terms that they have already obtained from clients. The United States concluded that barring the PCIC members from enforcing existing LOL terms is not necessary to remediate anticompetitive effects of the challenged conduct. In this respect, the harm to clients resulting from anticompetitive imposition of LOL is prospective and uncertain, and as the great majority of actuarial clients do not experience faulty actuarial work, would arise only infrequently. Rather than seeking broadly to prohibit the enforcement of existing LOL terms, the United States believes it sufficient that clients against whom LOL terms may ultimately be advanced will then have the opportunity to assert invalidation of the terms as having been unlawfully imposed.

The United States also considered but did not require the PCIC members to be barred from prospectively implementing LOL in new client engagements for a period of time, as a means of restoring market conditions pre-dating the conduct challenged in the Complaint. The United States determined such a measure to be unnecessary because at the present time significant competitive alternatives continue to exist for clients seeking to avoid LOL. One non-PCIC competitor, the largest actuarial consulting firm serving multi-employer clients, has to date chosen not to implement LOL. Another of the non-PCIC firms, which is the second leading competitor as to public clients and the third leading competitor as to corporate clients, has implemented a relatively less onerous form of LOL that purports to confine recovery to direct damages, rather than the more commonly used limitation to a fixed dollar amount or multiple of fees. Certain other firms that have begun implementing LOL have done so under policies that make

allowances for clients to avoid LOL in their contract negotiations.

*VII. Standard of Review Under APPA for the Proposed Amended Final Judgment*

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment ''is in the public interest.'' 15 U.S.C. 16(e)(1). In making that determination, the Court shall consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon a competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. 16(e)(1)(A) and (B). As the United States Court of Appeals for the District of Columbia Circuit has held, the APPA permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States* v. *Microsoft Corp.*, 56 F.3d 1448, 1458–62 (D.C. Cir. 1995).

''Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene.'' 15 U.S.C. 16(e)(2). Thus, in conducting this inquiry, ''[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process.'' 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney.[2] Rather:

[a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making it public interest finding, should* * * carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States* v. *Mid-America Dairymen, Inc.*, 1977–1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977).

Accordingly, with respect to the adequacy of the relief secured by the decree, a court may not ''engage in an unrestricted evaluation of what relief would best serve the public.'' *United States* v. *BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States* v. *Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460–62. Courts have *held* that:

[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is ''within the reaches of the public interest.'' More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel,* 648 F.2d at 666 (emphasis added) (citations omitted).[3]

The proposed Final Judgment, therefore, should not be reviewed under a standard of whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it mandates certainty of free competition in the future. Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. ''[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.' '' *United States* v. *AT&T,* 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette,* 406 F. Supp. at 716), *aff'd sub nom. Maryland* v. *United States,* 460 U.S. 1001 (1983); *see also United States* v. *Alcan Aluminum Ltd.,* 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint; the APPA does not authorize the Court to ''construct [its] own hypothetical case and then evaluate the decree against that cast.'' *Microsoft,* 56 F.3d at 1459. Because the ''court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place,'' it follows that ''the court is only authorized to review the decree itself,'' and not to ''effectively redraft the complaint'' to inquire into other matters that the United States did not pursue. *Id.* at 1459–60.

*VIII. Determinative Documents*

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: September __, 2005.

Washington, DC.

Respectfully submitted,

Mark J. Botti,
*Chief, Litigation I Section.*

_____

Weeun Wang,

Ryan Danks,

*U.S. Department of Justice, Antitrust Division, Litiation I Section, 1401 H Street, NW., Suite 4000, Washington, DC 20530, 202–307–0001.*

**Certificate of Service**

I hereby certify that I served a copy of the foregoing Competitive Impact Statement via facsimile and first class United States mail, this 12th day of September, 2005, on: Paul C. Cuomo, Esq., Howrey LLP, 1299 Pennsylvania Avenue, NW., Washington, DC 20004–2402, Fax (202) 383–6610, Attorney for Defendant PCIC.

/s/ _____

Ryan J. Danks,

*Attorney, United States Department of Justice.*

[FR Doc. 05–18703 Filed 9–20–05; 8:45 am]

**BILLING CODE 4410–11–M**

---

[2] *See United States* v. *Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (recognizing it was not the court's duty to settle; rather, the court must only answer ''whether the settlement achieved [was] within the reaches of the public interest.'') A ''public interest'' determination can be made properly on the basis of the Competitive Impact Statement and Response to Comments filed by the Department of Justice pursuant to the APPA. Although the APPA authorizes the use of additional procedures, 15 U.S.C. 16(f), those procedures are discretionary. A court need not invoke any of them unless it believes that the comments have raised significant issues and that further proceedings would aid the court in resolving those issues. *See* H.R. Rep. No 93–1463, 93rd Cong., 2d Sess. 8–9 (1974), *reprinted* in 1974 U.S.C.C.A.N. 6535, 6538.

[3] *Cf. BNS,* 858 F.2d at 464 (holding that the court's ''ultimate authority under the [APPA] is limited to approving or disapproving the consent decree''); *Gillette,* 406 F. Supp. at 716 (noting that, in this way, the court is constrained to ''look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass''). *See generally Microsoft,* 56 F.3d at 1461 (discussing whether ''the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest' '').